John H. LARY, Jr., Plaintiff,

v.

The REPUBLIC OF CUBA, a foreign government, Defendant.

No. 86 Civ. 0726 (RWS).

United States District Court, S.D. New York.

July 30, 1986.

John H. Lary, Jr., M.D., pro se.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for defendant; Michael Krinsky, Mark Barenberg, of counsel.

SWEET, District Judge.

Plaintiff Dr. John H. Lary, Jr. ("Lary") has brought this action *pro se* seeking to recover on principal and interest due on Cuban bearer bonds issued by the defendant Republic of Cuba ("Cuba") in 1937 and 1953. Cuba now moves to dismiss this action pursuant to Rule 12(b), Fed.R.Civ.P. because the action is (1) barred by the doctrine of sovereign immunity, (2) barred by the act of state doctrine, (3) barred by the statute of limitations, (4) prohibited by the Cuban Assets Control Regulations of the Treasury Department, and (5) barred by the failure to obtain a Treasury Department license for the purchase of or suit on the bonds. For the reasons set forth below, Cuba's motion to dismiss is granted.

**Prior Proceedings**

The original complaint in this action was filed on November 9, 1983 in the Northern District of Alabama but was dismissed *sua sponte* and without prejudice, and was refiled on August 22, 1985. Cuba moved to dismiss or transfer the action because ven-

ue was improperly laid in the Northern District of Alabama within the meaning of 28 U.S.C. § 1391(f) governing venue for actions against foreign states. On December 27, 1985, the action was transferred to the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(f)(4).

The District of Columbia District Court entered an order on January 10, 1986, *sua sponte* transferring the action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), concluding that only New York had contacts with Lary's claims and that venue in New York would best serve the convenience of the parties and the witnesses.

On January 23, 1986, Cuba filed a motion for extension of its time to answer or move, which was granted by memo endorsement of February 24, 1986. On March 5, 1986 Cuba filed the instant motion to dismiss. In a letter application to the court on April 4, 1986, Lary requested and was granted an extension of time to respond to the issues raised by the defendant's motion, the opposition papers due on June 4, 1986. Lary has submitted no opposition to Cuba's motion to dismiss, and has not provided the court with his own affidavit in opposition to the motion.

**Facts**

Sometime after 1979, Lary purchased the Cuban bonds upon which he sues from a brokerage firm in Huntsville, Alabama at a "substantial discount" from the approximate face amount of the bonds, which Lary estimates to be somewhere between $10,000 and $100,000. The debt obligations involve two series of bearer bonds, the "Four and One-Half Percent (4½%) Bonds of the External Debt of the Republic of Cuba, 1937–1977" (the "1937" issue) and "The Republic of Cuba Veterans, Courts and Public Works Bond Issue Four Percent (4%) 1953–1983" (the "1953" issue).

Both series of bonds were issued by the Republic of Cuba, and executed by its Minister of Finance. Principal on the 1937 issue was due on June 30, 1977 and principal on the 1953 issue was due on November 1, 1983. The coupon interest and principal amount of the 1937 issue was payable either at the office of Manufacturers Hanover Trust Company ("MHT"), the Trustee and Fiscal Agent, or at the MHT branch office or agency in Havana. The coupon interest and principal amount of the 1953 series was payable only in Havana, at the offices of the Banco Nacional de Cuba.

The Cuban Government failed to pay the interest coupons on the 1937 bonds due December 31, 1960, and failed to pay the interest coupons attached to the 1953 series beginning November, 1960.

Although it is unnecessary to recite the history of the deteriorating relationship between the United States and Cuba during the decades of the 1950's and 1960's, *see Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106 (2d Cir.1966); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F.Supp. 412 (S.D.N.Y. 1980), *aff'd and modified*, 658 F.2d 875 (2d Cir.1981), a brief review of the statutory scheme devised in response to these developments is warranted.

On July 8, 1963, the United States promulgated the "Cuban Assets Control Regulations ("CACR") of the Treasury Department, 31 CFR Part 515, originally authorized by Trading with the Enemy Act ("TWEA"), 50 U.S.C.App. § 1 *et seq.* and subsequently authorized by the International Emergency Economic Powers Act of 1976, 50 U.S.C. § 1702(a)(1)(B). These regulations, among other things, prohibit the transfer of "any property or evidences of indebtedness" in which Cuba or any national thereof has "had an interest of any nature whatsoever, direct or indirect." 31 CFR Part 515.201(b). The program was aimed at prohibiting all financial and commercial transactions between the United States nationals and Cuba and Cuban nationals and to place all of the Cuban property in the United States under the control of the Treasury Department. The Regulations prohibit engaging in the transactions listed without obtaining authorization from

the Secretary of the Treasury, usually granted in the form of a license. 31 CFR § 515.201(a).

## Discussion

According to Cuba, Lary's admitted failure to obtain a license from the Office of Foreign Assets Control ("OFAC") before purchasing the bonds or bringing an action on such bonds deprives the court of jurisdiction to consider these claims as the executive regulations require a license for such actions.

The CACR regulations explicitly extend to the type of assets at issue here and the parties to this action. First, with regard to Lary's purchase of the bonds, the regulations nullify transfers after the July 8, 1963 effective date of the regulations:

> Any *transfer* after the "effective date" which is in violation of any provision of this part or of any regulation, ruling, instruction, license or other direction or authorization thereunder and involves any *property* in which the designated national has or has had an *interest* since such effective date is null and void and shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property.

31 CFR Part 515.203(a) (emphasis supplied).

Cuba, the "designated national" has had an "interest" in the bonds within the meaning of section 515.312, as it is obligor on these debts, which fall explicitly within the definition of "property" set out in 31 CFR 515.203(f).[1] Cuba contends therefore that Lary's purchase of the bonds is null and void, as no attempt has been made to request a Treasury Department license.

Similarly, Cuba asserts that persons seeking to prosecute actions upon such controlled property must obtain an OFAC license, which Lary has also neglected to request. The CACR provisions expressly bar the issuance or entry of any judgment against Cuba without a license, as 31 CFR Part 515.310 defines the prohibited "transfer" to include" ... the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order...." Furthermore, section 515.-203(e) sets out the consequences for failing to obtain such license:

> Unless licensed or authorized by § 515.-504 or otherwise licensed or authorized pursuant to this chapter, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the "effective date" there existed the interest of a designated foreign country or national thereof.

Cuba, therefore, asserts that the prosecution of this lawsuit on a Cuban bond is an act by a United States national, the purpose and intent of which is to create a right and remedy with respect to the indebtedness on the bonds. As such it would be null and void without a license.

█ While Lary might attempt to avail himself of the exceptions to the voiding of property transfers in subsection (d) of Part 515.203, a filing of a report with the Treasury Department pursuant to subsection (d)(3) is a prerequisite to the OFAC's evaluation of the applicability of the exceptions contained in (d)(1) and (d)(2). Furthermore, although the Treasury Department evaluates compliance with paragraphs (d)(1) and (d)(2), the circumstances of Lary's possession of the bonds, namely that he speculated on their purchase with full knowledge of their dubious integrity as financial instruments, weighs heavily against the notion that he would be found an innocent purchaser of the bonds who was the victim of

---

1. Section 515.203(f) provides: "For the purpose of this section the term "property" includes gold, silver, bullion, currency, coin, credit, securities (as that term is defined in section 2(1) of the Securities Act of 1933, as amended) bills of exchange, notes, drafts, acceptances, checks, letters of credit, book credits, debts, claims, nego-tiable documents of title, mortgages, liens, annuities, insurance policies, options and futures in commodities, and evidences of any of the foregoing. The term "property" shall not, except to the extent indicated, be deemed to include chattels on real property.

misrepresentations. In any case no such allegation is made here.

The relevant case law generally supports Cuba's view of the Treasury license as a prerequisite to both the purchase of the bearer bonds and the maintenance of an action on the bonds. At the threshold, it is worth observing that the Cuban Asset Control Regulations have long been recognized by this circuit and the Supreme Court as both important to the foreign policy objectives of the United States and as regulations validly authorized under the TWEA. *Banco Nacional de Cuba v. Sabbatino, supra,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Sardino v. Federal Reserve Bank, supra,* 361 F.2d 106 (2d Cir.1966).

In this context, the courts of this circuit have not hesitated to give full force and effect to the CACR requirement that persons who wish to engage in transactions prohibited by the regulations apply to the OFCA for a license to do so. For example, in *Richardson v. Simon,* 420 F.Supp. 916 (E.D.N.Y.1976), *aff'd,* 560 F.2d 500 (2d Cir. 1977), *appeal dismissed,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 536 (1978), the executors of an estate sought the release of blocked assets in the Bank of Nova Scotia devised to a United States citizen and resident. The plaintiffs applied to the Secretary of the Treasury for a license unblocking the assets but were denied such a license, and the court held that it would not order the transfer of property in which a Cuban interest existed without a license authorizing the transfer. *Id.* at 919.

Similarly, the District of Columbia Circuit Court recently reaffirmed the breadth of OFAC's licensing power in *American Airways Charters, Inc. v. Regan,* 746 F.2d 865 (D.C.Cir.1984). Holding that although an OFAC license is required prior to execution of any transaction prohibited by TWEA, OFAC lacked the authority to block the formation of an attorney/client relationship because of failure to apply for a license, the court stated:

> To clarify and summarize our disposition, we add these closing remarks. TWEA,

as implemented by the CACR, gives OFAC authority to control, in almost every respect, AAC's [a designated Cuban national under 31 C.F.R. § 515.302] commercial relations with the outside world ... OFAC's power, however, extends only to the freezing or blocking of AAC's assets and the licensing of its transactions.

*Id.* at 874.

The single precedent upon which Lary might rely to claim that he did not need to obtain a license is inapposite to this context. In *Dean Witter Reynolds, Inc. v. Fernandez,* 741 F.2d 355 (11th Cir.1984), the Eleventh Circuit held that although two Cuban government corporations had failed to obtain a license from the Treasury Department prior to filing suit, they were under no obligation to obtain a license when the district court would establish liability and fix damages rather than levy upon property or collect funds. *Id.* at 361–362. However, in *Dean Witter Reynolds, Inc. v. Fernandez,* the Cuban corporations did obtain a Treasury license after the district court ruled in their favor and prior to the notice of appeal, although the issue of prior licensing was never raised before the district court. This Treasury Department license provided that the authorization extended retroactively to the date upon which the action was commenced.

Furthermore, although the court held that a Treasury Department license is not a prerequisite to initiating an *in personam* lawsuit, its rationale reaffirmed the need to secure approval before a bond *purchase:*

> The Assets Control Regulations forbid only those judicial acts that transfer a property interest. Since an *in personam* lawsuit is merely an attempt to establish liability and fix damages so that one's interests will be protected until a license is secured or until the regulations are suspended, the action does not focus on any particular property within the jurisdiction.

*Id.* at 362.

■ As Lary's speculative purchase of Cuban bearer bonds in 1979 was undoubt-

edly a transfer of an asset and not the attempt to "protect" interests until a license could be secured, it falls outside the scope of *Dean Witter.* *See also Tagle v. Regan,* 643 F.2d 1058, 1067 (5th Cir.1981) (*citing Propper v. Clark,* 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949)).

For the reasons set forth above, Lary's action is dismissed for failure to obtain a Treasury Department license prior to purchasing or commencing an action on the bonds.

IT IS SO ORDERED.